Good afternoon, Illinois Appellate Court, 1st District Court is now in session, the 6th Division, the Honorable Justice Mary McBeth presiding, case number 1-9-0-8-5-4, Mindo, Oman, MD vs. Glenn Health and Home Management Incorporated. Good afternoon, counsel. Welcome to our Zoom oral argument. Would each lawyer who is going to speak this afternoon, please state your name for the record and tell us which party you're representing. Good afternoon. My name is Brian Spencer and I represent Plano, Fino, Oman. Good afternoon, your honors. My name is Elizabeth Bartolucci and I am representing the Defendant Appellees. Okay. Welcome to both of you. And I see that your client is here as well, Mr. Spencer. I'm sorry. No, that's not your client. I'm sorry. Who is this other gentleman? Nicholas Kreitman on behalf of Amicus Illinois Trial Lawyers Association. Okay. All right. I saw the name Oman next to you because that's the name of the case and I made an assumption, something we should never do, correct? All right. The way, and it is not our intention to allow Amicus to argue this afternoon. Did you have any different perception? You have to unmute yourself. No, that's fine, your honor. All right. So the way we're going to proceed is we're going to allow each side to speak for about five minutes uninterrupted. And then I will turn to each of the justices, beginning with Justice Harris and then Justice Griffin and then myself and see what questions we would like to direct to you. Mr. Spencer, would you like to reserve any time for rebuttal? From those five minutes, your honor? You don't have to take it. I'll give you five uninterrupted minutes. Just tell me if you'd like to have some time for rebuttal. I would like to reserve a very short amount of time for rebuttal. Okay. I'll give you a very short amount of time. Two minutes. All right. All right. Mr. Spencer, whenever you're ready. Thank you. The main question that's presented today is whether or not the whistleblower act should be read broadly, which would encourage people to shed light on wrongdoing, or to be read narrowly, which will only keep wrongdoing in the dark. There's also a secondary question as to whether Illinois law should allow someone who is exercising power over another in actual control, whether that person can avoid liability, because the conduct at issue in the case does not match how the parties had planned it out when forming their initial contract, which governed the relationship. I'll first address the issue relating to the whistleblower act. We all know what the act says. The relevant portion is that it applies to a hospital, nursing home, clinic, or any medical facility that is a healthcare facility funded in whole or in part by the state. This court is instructed to give meaning to the plain language of the statute and plain English dictates that funded in whole or in part by the state modifies any medical facility. Now the fourth district in the Larson case, and the defendants would have the state funding clause modify every word beginning with the word hospital. However, hospitals, nursing homes and clinics are also medical facilities, making this entire list unnecessary and redundant. If the legislature wanted state funding to be the criteria, which determined whether the whistleblower act applies, they should have just written that it applies to a physician who practices his or her profession at any medical facility funded in whole or in part by the state and left out the rest of the list. Reading the plain language of the statute should have been the end of the issue in this case, and also the end of the issue in the Larson case. It wasn't, which leads me to my next point. The Illinois legislature had a debate, and this very issue came up. Representative Elaine Nekritz said verbatim that it applies to those who are, quote, accepting public money, end quote, meaning, quote, a single Medicaid or a single Medicare participant. Now, the Larson court disagreed with that interpretation. It did not consult the legislative history, and I'm asking the court to decline to follow the Larson decision. The briefs that were submitted were mainly on application of the law and did not address the policy considerations involved, should this court actually decline to follow the Larson decision. The purpose of the whistleblower act is to encourage the reporting of wrongdoing and to protect those who report it or refuse to participate in it. So who would benefit from a narrow reading of who is protected? Only those whose conduct would give rise to claims. Now, nursing homes and hospitals, they rely on Medicare and Medicaid money, and Representative Nekritz in the legislative debate talks about how doctors are in the best position to report Medicare fraud. So a narrow reading of the Larson decision will only make it more difficult to bring light to Medicare fraud, which is not good for the state of Illinois. Imagine a small clinic with a senior doctor and a junior doctor. The junior doctor is right out of med school and notices that the senior doctor is committing Medicare fraud and wishes to report him. Under the Larson decision, the junior doctor would only be protected in the rare event that the senior doctor or the clinic overall was the recipient of perhaps an experimental clinical trial, a very narrow interpretation of the statute. That's not the goal that the legislator had in mind when passing the whistleblower act. Mr. Spencer, if you want to address the retaliatory discharge claim, you have only very little uninterrupted time to do so, so I wanted to alert you to that. Thank you for bringing that to my attention, Your Honor. We concede that plaintiffs signed a contract identifying themselves as an independent contractor and that the traditional indicia of employment, such as deducting for payroll expenses, is not present here. Our main issue is that the exercise of control should be the test, as opposed to reserving the right of control, because I would analogize a contract formed by the conduct of the parties, which is called an implied-in-fact contract. So certainly the parties executed a contract that said plaintiff is an independent contractor and this is what's going to happen. But over the course of the next several years, that's not what happened. And the court should not disregard the conduct in determining whether a plaintiff was an independent contractor or an employee. And the conduct here shows actual control. I would direct the panel to plaintiff's affidavit on pages 2932 through 2947, which all addresses actual control. I'll highlight a few examples. Page 2935, plaintiff orders defendants to administer a medication and instead of doing so, the defendants change the patient. This directly causes plaintiff to lose money. This is manipulation beyond just control. Affecting someone's ability to make money is manipulating them into getting what you want. Page 2938, plaintiff didn't cooperate with the defendant's relationship with Passages Hospice, so they again began switching patients with him. Page 2936, plaintiff wrote a prescription for certain medications. Defendants didn't ask him to switch the medication. This is unlike a pharmacy calling a doctor to substitute a generic to save the patient some money. The defendants just shipped the medication without the plaintiff's consent or knowledge. Dr. Uman's reputation was on the line. You know, if the medication caused an interaction, that's the whole reason that a doctor administers medications and oversees the process. If there was a medication interaction that went bad, it was Dr. Uman's reputation that was on the line. It was Dr. Uman's malpractice liability that was on the line. And it was doctor's medical license that was on the line. So this is. Mr. Spencer, I'm going to stop you, and I'm going to see what questions the court has at this point. Mr. Harris, Justice Harris, sorry, do you have any questions for counsel? Thank you, Justice. No, I don't. Justice Griffin. Yeah. Yeah, I forgot that. The idea that the control issue. The defendant argues that most of the things that you point out aren't their ability to control the plaintiff. It's the plaintiff's inability to control the defendant. How would you how would you respond to that? I would just point, you know, actually to the things that I just said, which is, you know, a doctor's what does the doctor do? He make he or she thinks, you know, assesses a patient and makes decision based on treatment. The defendants changed what he was doing. The defendants were using his license to practice medicine and making him responsible for it. Okay, but that that isn't controlling him. That's them not following his direction or control. Right. But, you know, the treatment is still this isn't an academic debate between them. You know, the treatment is still occurring and they're still doing the patient is still receiving this care. So, you know, control the test in the other cases is controlling the manner in which, you know, the plaintiff conducts the work and the manner in which Dr. Newman conducted his work is he would prescribe silver treatment or he would prescribe a treat a drug for MRSA. And if a different drug was dispensed, that is the actual manner in which Dr. Newman practices his medicine. I don't have anything else. Thanks. Should I keep speaking? No, I'm sorry. I was I had to unmute myself. I had a couple more questions for your console. You talk a lot about the purpose and the policy behind the whistleblower act, but we don't get to that until unless the language supports the claim that you're trying to break. Correct. Yes, but There will be consequences of whatever the court rules today on other cases. And I'm just advocating for the court to make to keep that in mind when they make their ruling that the language should the plain language of the act should encompass Dr. Newman within within the statute. Is your argument that the plain language encompasses him and is unambiguously or is your argument that the language is ambiguous and therefore we can look to the legislative history. Well, that kind of puts me in a pickle, Your Honor. My, my personal opinion is that the language is poorly drafted. And the my opinion is that the language is unambiguous and Dr. Newman should fall within the plain language of the of the act itself. However, you know, my opinion doesn't amount to nearly as much as the Fourth Circuit Court of Appeals opinion. So because the courts are The fourth district, I should say, I should say, Court of Appeals has this opinion that's out there and the Fourth Circuit considers it ambiguous and had to consult blacks law dictionary and federal statutes. We do have to, you know, I do have to argue that in the event that the court finds that the statute is ambiguous that we can consult the legislative history. Okay, I think the fourth district's point of view was that it wasn't ambiguous and that they can look to dictionary meetings to understand a statute without finding them be any ambiguity, their position was that it was not ambiguous. Am I do disagree with that. I do disagree with that. I think that they, you know, they consulted other statutes, you know, well, they look to the language of There would be no reason for them to open a dictionary or to consult other statutes or I believe they consulted a school board funding unless they're buttressing a certain opinion as to their interpretation of the actual language that's in the statute. Ms. Bertolucci, are you ready to proceed. Thank you, counsel. Thank you. I am your honor. I will start with the retaliatory discharge claim. That's where most of counsel's argument left off. So we've got obviously claims against the corporate entities, the employer entities, if you will, or the medical facility entities and then we have claims against individual agents or employees of those entities. So obviously we don't get to any claim against the individuals. If Dr. Uman can't state a claim for retaliatory discharge at all due to his status as an independent contractor. So on that issue, I think it's imperative that before we even get to the cases discussing the elements and the factors that demonstrate Someone is an employee versus an independent contractor. We have to look at Dr. Uman's own specific admissions Judicial admissions in that respect. And there are two key ones that I should point out to the court. First of all, which is In the record at C-2576, Dr. Uman provided the healthcare consultants report to support his prior patients, Families, or estates wrongful death case against their complaints against the defendants in a separate lawsuit. So Dr. Uman himself provided the healthcare consultants report submitted with a complaint filed in that separate wrongful death action in which he expressly stated he was an independent contractor. That is a judicial admission. And as the court knows to the doctrine of judicial estoppel to apply a party must or an individual must benefit from the prior Inconsistent representation or admission. And in this case, I think that Dr. Uman's benefit is clear because Siding with the estate and the plaintiff through the same attorney, as you see here today, meant that he wasn't named as a defendant in that lawsuit. In many nursing home cases, the treating physician is named as a defendant. So Dr. Uman instead sided with the estate of the resident who passed away and supplied the healthcare consultants report to support that medical negligence and wrongful death Complaint. That is a judicial admission in which he has admitted he was an independent contractor and he definitely benefited from invoking that status. Now, in this case, he finds that that status does not suit him and he wants to be treated as an employee. Well, it's not appropriate and I would urge the court to note this inconsistency. Also, in an affidavit that Dr. Uman provided in opposition to the defendant summary judgment motion. He also admitted that he was an independent contractor and his affidavits at C-2932. He admitted that the affidavit of defendant Thompson correctly stated that he was an independent contractor with Brentwood North. So he's made not only a judicial admission in another case, but in this case that he was an independent contractor. So I think before the court even needs to get to the individual specific facts of this case, it should take very seriously those prior judicial admissions. Then if we do turn to the question of control as the feed case and many other cases say the critical issue is whether the defendant reserved the right to control the individual's actions. And here, as just Judge Ezrig noted, and as the court has noted, the facts that Dr. Uman cites as evidence of control are truly ways in which the facility did not follow his orders or his commands. Not that they impacted the way he practiced at all. And he also seems to advocate for a new test that should be implied on the control and employee-employer status issue specific to positions. He's asking you to do a lot of things today, actually, that are well beyond anything that's ever been done by the courts in Illinois. He's asking you to create a new test for the employer-employee relationship for physicians. And I'm sure all of you judges have encountered cases involving apparent agency issues with medical malpractice cases. Doctors being independent contractors, emergency room doctors who are independent contractors at hospitals. Dozens and dozens and dozens of cases and no court to date has felt the need to create a separate test of control for physicians. So I would urge you to decline that invitation today because there's just no basis for it. Secondly, if you do adopt the kind of test Dr. Uman advocates for, he's basically asking you to consider his subjective feelings. He literally says in his affidavit that he felt controlled. Your Honor, we can't go by that standard. We cannot go by an independent individual's attestation and an affidavit that he crafted to specifically avoid summary judgment of saying I felt control. That cannot be a test that Illinois courts employ. They have to have some objective grounds for finding control. And here, none of those existed. As the court noted, everything he complains of was really that the facility did not do certain things he wanted or do them the way he wanted. There are no examples of control. And most importantly, he completely ignores the fact that he has contracts with these entities. And none of those contracts reserve the right to control him. They're very broadly worded, very open to his exercising his discretion in the practice of law. And it's extremely odd that he almost ignores the fact that he had contracts with these two entities. And it's because he wants to pursue a tort claim where he can get more significant damages. He's sought punitive damages in the past. He knows he cannot get punitive damages on a breach of contract claim. And as we cited in our brief, there are many, many cases where physicians have had privileges revoked from facilities and have brought legal action. There is a remedy for Dr. Uman. There are injunctive. I'm going to stop you, too, before you run out of time and ask you to address the other claim, the whistleblower claim. Thank you, Your Honor. As to the whistleblower claim, I think it's if the court is going to go outside the language of the statute itself, which is a hurdle right there for you to even decide you want to do that. You could look at the plain language of the statute and decide, no, funding has a very specific meaning. And as the Larson court noted, it does have a very specific meaning and it does not seem to involve the payment and compensation for services. It's a funding of something beyond an exchange for services. So the court could very justifiably rely on Larson and look only to the plain language of the statute. However, if you were to look at the legislative debate, I would urge you and it's ironic that counsel and his examples actually of potential cases under the whistleblower act. He talked about Medicare fraud cases, and this is not a Medicare fraud case, as the court knows. And the language and the rationale for the expansion of the definition of employee that the congresswoman gave when she did present some information on this bill was that the physicians and other health care professionals are in a very good position to see if there's Medicare or Medicaid fraud going on. So her own words tell us that this definition was expanded in large part, if not exclusively, to enable physicians who are not employees of medical facilities, but they witnessed Medicare or Medicaid fraud to report that. So if the court is inclined to go beyond the plain language of the statute, I urge you and to look at the legislative history. Then I urge you to look at all of the legislative history, which specifically indicates the definition was expanded to enable doctors to report Medicare and Medicaid fraud. And we have to, you know, it's a slippery slope when a court decides to go outside the words of the legislature. And how far outside the words of the legislature are we going to go? If you go to the legislative history, then I recommend you stick with the basis provided in the legislative history. And here, the clear basis provided in the legislative history was to allow physicians to report Medicare and Medicaid fraud. I'll stop there to now let you have any questions. Thank you. Justice Harris, do you have any questions? Thank you. No, I don't. Thank you. Justice Griffin. Thanks. You know, when I see the wording in question in the act, it says, Licensed physician who prayed, they're trying to make address the fact that they're not an employee, but we're going to make them covered by the act. And licensed physician who practices his or her profession in whole or in part at a hospital, comma, nursing home, clinic, clinic, comma, or medical facility that's a health care facility funded in whole or in part by the state. Doesn't that indicate, as counsel argued, that that clause funded in whole in part by the state covers a medical facility? It's as opposed to the whole sentence. To me, the comma before or does that. It separates it. Well, Your Honor, I could be wrong here, but having a child in elementary school right now, I have brushed up a little bit on my grammatical rules, and I believe that comma is called an Oxford comma. And I believe it is truly just the separation for clarity's sake. I do not believe it was intended to separate out medical facilities from the other types of facility described. And I think if we are going to look to the legislative history, I don't think that warrants that kind of interpretation either. There's no distinction among the different facilities listed. So that's my response to that argument. I do not believe that it can be legitimately read to qualify or describe only a medical facility, the generic medical facility. I think the medical facility truly was a catch-all to make sure that any other type of medical facility that could be imagined that receives Medicare or Medicaid funds or monies or payments would be encompassed. But I do disagree with that grammatical interpretation. And I'll go back and look at this, but you place some significant emphasis on limiting it to Medicare or Medicaid fraud. Because those were the examples they talked about at the legislature, you said. Does anybody say, though, we're limiting it to that? Nobody says that it's limited to that, but the debate that is provided truly only lists that as the type of thing that they want physicians practicing at these facilities to be able to report with impunity. So if we are going to go outside the language of the statute itself, and we are going to rely on the legislative history, then I really think we should stick to the legislative history that's in front of us. And I'll check with my granddaughter on that Oxford comma thing. I could be wrong. I could be wrong, but I'm just throwing in what I'm learning as a Zoom teacher parent. Thank you. That's all I have. Thank you. I'm going to stay away from the Oxford comma, but I want to pick up on your interpretation of the legislative history. If, in fact, the legislative history suggests, and the amicus brief particularly focuses on this, suggests that the employee definition was expanded to specifically include doctors working at facilities that were funded by Medicaid payments and Medicare payments. And that's the argument, that that was the intent of the expansion. The legislative history makes that clear. Then it would certainly include Dr. Uman, correct? He worked at a facility that got Medicaid payments, correct? Correct. And Your Honor, however, I do ask, I do have to put a pause there because I think that in addressing this issue, we also have to look at how it came to Judge Ezra, if you'll permit me, if I've answered your question. Okay. So, you know, I thought about this statute, and it's obviously a laudable statute. No one should be fired for doing the right thing. And I thought about what the court's role is in deciding this case. And, you know, I think a big picture of the court would agree that its job is to decide this case. It is not to be the defender necessarily of the whistleblower act or to support the representative who sponsored the bill's intentions. I think that your job is to decide this specific case and the way it came to you and the way it was presented to Judge Ezra. And I do think it's very important to discuss the procedural way it got to him. I find the procedure quite unacceptable, actually, because in responding to my client's summary judgment motion, these arguments regarding the legislative history were not made. All right. Don't go back to forfeiture until you answer my question. We can discuss forfeiture, but I want you to answer my question. How does the statute, what does the statute mean under your interpretation? What does employee mean if it doesn't mean, based on the legislative history, doctors who work at facilities that are funded by Medicaid and Medicare? There's no interpretation of the statute that I can think of. So I'm asking you if you can think of one that says it covers doctors in the traditional sense that are traditionally employees. And it covers doctors who happen to be bringing Medicare and Medicaid fraud claims. I don't see how the language gets you there. You have to use the history to understand the language. And there is an interpretation of the language that says funded means you get Medicare payments. That's the whole amicus brief. So putting aside for the moment whether we can look at the legislative history, tell me what your interpretation of the statute is based on the legislative history as you understand it. If we do rely on the legislative history, I believe that the Congresswoman intended this to apply to any facility that accepts Medicare and Medicaid funds. Okay. That's the only way to read it if we look at the legislative history. Correct? Correct. Okay. And that would include Dr. Uman, correct? Yes. Whether he's bringing a Medicaid fraud claim or a claim of bad medical practices. It would cover him because his facility is covered. Well, I don't really want to concede that point because I think… Okay. Then if you won't concede that, give me what the statute means in your non-conceded way. I don't understand how you would interpret the statute to say it only covers Medicare and Medicaid fraud claims because there's no language that supports that. Well, I think that the language used in the statute was imprecise. I think it could have been better. And I'm sure the court encounters that situation a lot. So, the language is imprecise. If we go to the legislative history, the representative very clearly said the intent of this amendment is to allow physicians to report Medicare and Medicaid fraud. So, yes. I would say it's limited then to cases where Medicare and Medicaid fraud. Okay. And I'm asking you how the language supports that. And if you have an answer, give it to me. And if you don't, that's fine. But I just don't see how the language would support, oh, and it also covers claims of Medicare and Medicaid fraud. It either covers doctors in these facilities or it doesn't cover doctors who work in these facilities. And the history suggests that these facilities include facilities that are funded by Medicare and Medicaid. That's the argument on the legislative history. Well, I'm sorry if I keep getting thrown, but you do keep mentioning the word the language, the language. And I'm not sure if you mean the language of the statute or the legislative history. I mean the language of the statute. The language of the statute was to expand the definition of employee for purposes of this statute only beyond the common law understanding of employee. Right. It was to include facilities that were funded in whole or in part by the state. And the question is whether that funding includes payments of Medicare payments and Medicaid payments. That's the question. Well, I think, you know, I would analyze it the same exact way the Larson Court did if we weren't going to look to the legislative history. Because the language of the statute, the word funded to me has a very different connotation. I understand that. So here's my last question. What is your response to the amicus argument that funded in this context where there's an entire Medicaid safety net put in place by the state also includes making Medicaid payments. What's your response to that? I mean, I can't. I'm not going to say that the legislative history and that history that amicus council has provided don't make a good case for the fact that Medicare serves a purpose or Medicaid serves a purpose and that funding could be construed to include Medicare or Medicaid funds. I mean, I just can't. But I think that to get there, we have to plaintiff has to get over several hurdles that I don't think he's gotten over. You want to talk about forfeiture. We can talk about forfeiture. Well, just and I know the court doesn't like forfeiture, but I also don't think the court likes reversing circuit court judges on grounds that weren't plainly put before them. And here plaintiff's counsel, you know, acknowledged in his reply brief that the judge who previously ruled on the 2015 motion to dismiss that was brought in the case before plaintiff voluntarily dismissed it was not Judge Ezrig. It was a different judge. So when this came to Judge Ezrig, the summary judgment briefing, which was stopped midway through because plaintiff voluntarily dismissed his case, it resumed based on a new complaint or an amended complaint. And we filed our summary judgment motion at some point thereafter. And the only argument that plaintiff's counsel made in his response to our summary judgment, I mean, the vast majority of his response to our summary judgment motion was this whole corporate identity and piercing argument, which seems extremely premature to me. So when he finally did get to the whistleblower act, he did not make the argument he makes now. He just didn't. And he did try to incorporate his previous response to a previous motion to dismiss, but he didn't make the argument. And I mean, exhibits to summary judgment motions are essentially evidence in the form of affidavits or depositions, or they are documents to show to the court this thing was said before. So, you know, you say plaintiff's complaint alleges this. Okay, here's the complaint. Yes, it does say that, right? He can't make his argument, though, in opposition to summary judgment by simply attaching a prior motion. He has to make the argument in his brief so that the judge is fully aware of it. And the plaintiff assumed too much information, too much back history on the part of the judge. And I truly think that deprived not only the judge, but us of notice, we would have addressed in our reply brief a lot more strongly, probably, if we thought he was actually asserting this as an argument in opposition to summary judgment. He did not make it a clear argument in opposition to summary judgment. Judge Ezrig does not appear to have believed it was an argument that he was really addressing. And it was a throwaway at the end of his argument at the summary judgment hearing, literally one or two sentences, and no background, no history. I don't know that I can't recall. I'm sorry if the actual legislative history was even attached. I don't think it was attached to his response brief or the motion to dismiss. Some of it might have been set forth in his prior motion to dismiss that was incorporated as an exhibit. But I mean, I think that's the kind of practice that really has to be discouraged and should not form the basis for a reversal of summary judgment. When a judge has spent time and thought and care, he typed out a pretty comprehensive decision. Is it fair to reverse a judge on an argument that was not properly made to him? I don't think it provided him sufficient notice and it didn't provide us sufficient notice of the argument. So I do think this is an appropriate scenario for forfeiture. The argument is, you know, in the rule, how an appellate court can affirm on any basis found in the record. It can't reverse on any basis found in the record, right? The flip is not true. And here, that's what plaintiff is asking the court to do. I don't think you should be permitted to do it. I just want to clarify the only case that had been decided when this case was before Judge Estrick was the second district case that he relied on. Correct. There was no other. He was bound to follow that case. Larson is what you're. Yeah, that was a fourth district case. But you're right. Yeah. District. Yes. Sorry. You know, I shepherdized the statute yesterday and there's nothing else new. Right. So he had to follow that case. There was no other appellate court case for him to follow. Exactly. And that actually reminds me of another point, which is the fact that the legislature, if they felt that Larson was incorrectly decided and did not interpret the statute correctly, could have amended it. It's been five years since Larson came down. The legislature hasn't acted. All right. Thank you very much, counsel. Mr. Spencer, a brief rebuttal. Thank you. Very briefly, Judge, we shouldn't have had to address the, you know, the whistleblower act issue about the state funding issue in our motion or response to motion for summary judgment because the court had already decided the issue. Defendants raise it again in their motion for summary judgment. And in order to specifically stated in the supplemental record during the hearing on the motion for summary judgment. I mean, I knew that the judge He specifically stated to me or to us that he was bound by the Larson court. And he thought it was very cut and dry to use his language. So, yes, he did allow me to basically speak to the court reporter to preserve it for the record and it was incorporated in By reference into the response to the summary judgment motion, both the response brief verbatim and the court order, but this is all contained in the in the briefs. I don't believe the issue was forfeited. It's just, it wasn't the main issue of concern because it was very cut and dry. Defendant counsel discuss they distinguish between Medicare fraud. And this case. Well, this case, essentially what it boils down to is there was an underlying nursing home case. Nursing Home Care Act case, which is another statute and the defendants took actions to attempt to preempt liability under that statute. They're both violations of Illinois law. They're both attempts to frustrate the purpose of Illinois law and the court should not distinguish between Medicare fraud and, you know, issues relating to the Nursing Home Care Act. And regarding the judicial admissions. Defense Council mentioned the, you know, the benefit that plaintiff received from the health consultants report. The health consultants report was contained in a separate lawsuit brought under the Nursing Home Care Act. The benefit of that is was the plaintiff in that case, a woman named Carol Costello. Well, Harry Cavicchione Dr. Uman did not benefit from that case, other than whatever fee he charged back in 2015 for preparation of a health care consultants report under 2622 of the code of civil procedure. And then a plaintiff is is not proposing a new test. The Netzel decision, the case where the nurse was found to be an employee, even though she had signed a contract. Saying that she was an independent contractor. We plaintiffs allege that this case is analogous here. But what it lays out the test for determining an independent contractor. And one of the factors that can be taken into consideration is the skill required and the work to be done. Now, you know, she was a very, she was an unlicensed nurse in the Netzel case, but in this case, it's a physician. You know, if you if you think of these jobs is kind of like a hierarchy. I mean, the physician is at the very top of the hierarchy. And what was also, you know, an unlicensed nurse is at the very bottom of the hierarchy. So, you know, obviously, there's going to be a little bit of difference in the application of the rules. And all we are asking for is that the court, you know, accommodates the difference in the application of those rules and takes into consideration, you know, how that a doctor doesn't, you know, have a set start time and a set end time. The doctor's obligations to take care of every patient that, you know, he or she is responsible for. And so, if you're going to exercise control over a doctor, it's going to be in a different manner that you're exercising control over an unlicensed nurse. And so, we analogize that case, but there are, you know, there are differences. Nonetheless, we don't advocate a new case. And I would close by just saying we ask that the court decline to follow the Larson case and reverse the trial court's ruling. Thank you both for a very interesting case and arguments, and we will take this matter under advisement.